# AFFIDAVIT IN SUPPORT OF APPLICATION FOR WARRANT

Your affiant, Gerald Adams, Border Patrol Agent of the United States Border Patrol, being duly sworn, does depose and state the following:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Border Patrol Agent with the United States Border Patrol ("USBP") permanently assigned to Douglas, Arizona and detailed to Tucson, Arizona with the Prosecutions Unit. I have been an agent with the USBP since January 22, 2018. I completed the USBP Academy in August 2018, where I received instruction in constitutional law, immigration law, criminal law, and federal and civil statutes. I have also received instruction in the detection, interdiction, and arrest of narcotics smugglers, alien smugglers, and aliens illegally present in the United States.

2. As a Border Patrol Agent, I work routine field agent duties patrolling the Douglas Area of Responsibility ("AOR"). I have been involved in many apprehensions of undocumented aliens, alien smugglers, narcotic traffickers, and facilitators. I have processed and presented many cases for criminal prosecution and administrative proceedings.

3. In February 2023, I was first assigned as a Case Agent for the Tucson Sector Prosecution Unit. I have conducted investigations involving illicit activity and have gathered and structured evidence and facts pertaining to administrative and criminal cases. I have taken sworn statements from material witnesses and suspects. I routinely perform record checks through various law enforcement databases to establish accuracy of information as well as to gather facts further relevant to a respective case. I have acted as a liaison between the United States Attorney's Office and field agents, and I have assisted fellow agents in the development of their cases.

4. Through my training and experience with Alien Smuggling Organizations ("ASOs"), I have learned that the utilization of cellular phones to communicate between coordinators, foot guides, load drivers, stash house operators, etc., is the most common form of communication. Cellular phones often contain evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text,

1

email, other electronic messaging applications, and voice mail communications between the person who possessed or used the device and others. It is quite common for navigational coordinates to also be transmitted to and/or from these devices to determine the user's location through a GPS application. In many areas of the border, scouts use cellular phones to guide the groups to the pickup locations. Drivers of scout vehicles can relay information to the driver of the load vehicle either with a direct call or with applications ("apps") such as WhatsApp. Scouts will relay information such as the presence of Border Patrol. Drivers can also be guided by "pin drops" on apps such as Google Maps which will contain directions for the load vehicle. ASOs will utilize several different apps and functions on their phones to facilitate the coordination of a smuggling event, all the way from inception of the alien to delivery of the alien at the desired location in the United States. In addition, the apps that ASOs use may vary from cellular phone to cellular phone.

5. Migrants, as well as human smugglers, commonly have in possession and use more than one phone while being smuggled or while smuggling. Reasons for this include one phone for use and to receive cellular reception in Mexico, and the other one is for use and cellular reception in the United States. Other times, both migrants and smugglers are given a phone from the smuggling organization for its use to guide migrants further into the United States illegally.

6. The statements contained in this affidavit are based on information provided by fellow Border Patrol Agents and on my experience as a Border Patrol Agent in the USBP. Since this affidavit is submitted for the limited purpose of securing a search warrant, I have not included all facts known to me regarding this investigation. I have set forth facts that establish probable cause to believe that the defendant referred to in this investigation conspired with known and unknown individuals to transport illegal aliens, in violation of 8 U.S.C. § 1324. This affidavit is intended to show only that there exists sufficient probable cause for the requested warrant and does not portray all my knowledge about this matter.

7. I submit this affidavit in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the contents of two (2) seized cellular devices, defined below as **Target Device (TD),** alongside its respective number identifier (i.e. TD-1, TD-2, etc.) defined in Attachment A, and the extraction of

electronically stored information further described in Attachment B hereto. **TDs** are collectively identified as the **Target Devices.**

### IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED

8. The cellular phone(s) to be examined are:

   1. Black Samsung Cellphone (TD-1) (PACKAGE A8812111)
   2. Black Cellphone in White Case (TD-2) (PACKAGE A8812111)

9. The **Target Devices** are currently stored at the evidence vault maintained by Seized Property Specialists at Douglas, Arizona. They are to be searched pursuant to the attached Application are further described in Attachment A hereto.

10. The requested warrant would authorize the forensic examination of the **Target Device** for the purpose of identifying electronically stored data to include: any telephone numbers, including but not limited to numbers called, numbers stored for speed dial, pager numbers, names and addresses, electronically stored voice, and text messages, calling card numbers, text messages, photos, videos and/or identifying information that may be stored in the memory of the **Target Device**, as more fully described in Attachment B.

### PROBABLE CAUSE

11. On May 01, 2024, Border Patrol Agent (BPA) Dakota Araujo was assigned to line watch duties in the Douglas Border Patrol Stations Area of Responsibility (AOR). The BPA was notified that a gray Nissan SUV, bearing Arizona license plate 4SA84P, was seen traveling eastbound out of Douglas, AZ using State Route (SR) 80.

12. The BPA noticed a vehicle driving westbound on SR 80 passing their location by the Speedway gas station, seeming to match the description of the vehicle they were notified about. The BPA turned around in an attempt to get behind the vehicle, and the vehicle seemed to increase travel speed. Once caught up to the vehicle, the BPA confirmed the vehicle description and license plate number matched. Once behind the vehicle the driver slowed in speed, and the BPA requested a vehicle registration check and stolen/wanted vehicle records check through the Douglas Station Tactical Operations Center (TOC).

13. As the vehicle approached the intersection of SR80 and Highway 191, the driver activated his turn signal and abruptly jerked the vehicle in the turn lane. The driver continued northbound on Highway 191. Highway 191 travels north from Douglas AZ and is the fastest route of travel to Interstate 10. Smugglers use this route for quick travel to smuggle illegal aliens when the Highway 191 Border Patrol Immigration checkpoint is closed, as it was at this time. The BPA also noticed the driver's cellphone was mounted on the dash and the maps application was open indicating he was following the directions and likely not from the area.

14. As the BPA was traveling behind the vehicle, the driver would increase and decrease his traveling speed. During this time the TOC notified the BPA that the vehicle was registered as a rental vehicle. On Highway 191, the vehicle and the BPA approached a short passing lane and the driver moved over to the right. In the BPA's experience, this tactic is used to try to blend in with normal traffic or attempt to get law enforcement officers to pass the vehicle unnoticed. The driver then moved back to the left in front of the BPA's vehicle and continued northbound on Highway 191.

15. The BPA was able to notice two passengers in the vehicle, one in the front seat and one in the rear seat behind the front seat passenger. They were sitting very still and upright and seemed nervous, almost statue like. The BPA noticed the vehicle had a LYFT rideshare sticker. However, the vehicle did not have the LYFT placard illuminated, indicating to the BPA that the vehicle was not likely currently being used for that purpose.

16. The BPA attempted to perform a single agent vehicle stop to perform a brief immigration inspection of all occupants at Mile Marker (MM) 4 on Highway 191. The BPA activated their emergency lights and siren, the vehicle yielded shortly after.

17. As the BPA approached, they noticed four (4) subjects in the vehicle. The passenger in the rear behind the driver seemed to be sitting low attempting to conceal himself. The BPA knocked on the rear window to attempt to communicate with the occupants of the vehicle, and asked the driver if he would lower the window.

18. The BPA identified themself as a Border Patrol Agent and informed the subjects in English that this was an immigration inspection. The BPA asked what country they were citizens of to which the driver, later identified as Jose RAMIREZ-NAVA, replied "here" and the BPA confirmed

he meant he was a United States citizen. The BPA then asked the front seat passenger later identified in the English language if he was a United States citizen, and he did not respond. The BPA then asked if he spoke Spanish to which he replied "Yes". The BPA identified himself in the Spanish language and the three passengers, identified as Luis Armenta-Ruiz, Usiel Contreras-Lopez, and Alejandro Hernandez-Espinoza, admitted to being citizens of Mexico without the legal documents to be in or remain in the United States legally.

19. RAMIREZ-NAVA was placed under arrest for violation of 8 U.S.C. § 1324 and transported to the Douglas Border Patrol Station for processing.

20. While at the station, RAMIREZ-NAVA claimed both **Target Devices** as his cell phones.

21. Luis Armenta-Ruiz and Usiel Contreras-Lopez were detained as material witnesses. Counsel for Armenta-Ruiz and Contreras-Lopez interviewed them on May 15, 2024 in preparation for video depositions, and provided a summary of expected testimony to counsel for RAMIREZ-NAVA and counsel for the government.

22. According to material witness counsel, Ruiz-Armenta stated that he crossed the border with two other aliens and were being guided by phone. When they arrived near a road, they sent their location and were told to wait where they were. After waiting approximately two hours, they are told that their ride is about to arrive. Approximately a half hour later, they were told to go to the road because their ride was about to arrive. They were then sent a photo of the vehicle and approximately twenty-five minutes later, the vehicle arrived.

23. According to material witness counsel, Contreras-Lopez stated that he crossed the border with two other aliens and were being guided by phone. They were told to stop 15-20 minutes before arriving to Highway 80. They had a map on the phone and were given a location where to stop. After approximately two hours, they were told that the driver was coming and to go to the road. A photo of the vehicle was sent to another alien in his group. After hiding by the side of the road for approximately 20 minutes, they are told that their ride is almost there. A vehicle arrived and stopped on its own about four to five meters from them.

24. Based on my aforementioned training and experience investigating ASOs, I believe RAMIREZ-NAVA was using his cell phones to communicate with the coordinators for the smuggling attempts. BPAs observed RAMIREZ-NAVA using the map application on one of his cell phones. The drivers recruited by ASOs are often unfamiliar with the area where they are picking up undocumented non-citizens and are sent directions from the ASOs to the pick-up and drop-off locations. Additionally, the material witnesses were sent a photo of the pick-up vehicle and were told when their ride was almost to their location. ASOs often require drivers to send photos of their vehicle and send updates of their location to the coordinator so that undocumented non-citizens know which vehicle will be picking them up and when to get ready to load into the vehicle.

25. The **Target Devices** were seized from this event as evidence and are being stored by the Seized Property Specialists Douglas, Arizona. The **Target Devices** have been stored in such a manner that its contents, to the best of my knowledge, are in substantially the same state as when they first came into possession of the United States Border Patrol

## TECHNICAL TERMS

26. Based on my training and experience, I use the following technical terms to convey the following meanings:

a) <u>Wireless telephone</u>: A wireless telephone (or mobile telephone or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments and other information on personal calendars; and accessing and downloading

    information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b) <u>Digital camera</u>: A digital camera is a camera that records pictures and video as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos. Most cell phones currently manufactured contain digital cameras as a standard feature.

c) <u>Portable media player</u>: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock or games. Most cell phones currently manufactured contain portable medial players as a standard feature.

d) <u>Internet</u>: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. Most cell phones currently manufactured allow the use of the Internet as a standard feature. Further, most current cell phones allow the user to transmit electronic messages via standard email services or specially designed communication applications between parties.

27.     In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications and voice mail communications between the person who possessed or used the device and others. Navigational coordinates may also be transmitted to and/or from these devices to determine the user's location through a GPS application.  In many areas of the border scouts use phones to guide the groups to the pickup locations.  This allows the guides to maintain a safe distance and insulate themselves from the group and thus evade apprehension.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

28.     Based on my knowledge, training, and experience, I know that electronic devices such as the **Target Devices** in this case, can store information for long periods of time.  Similarly, things that have been viewed via or uploaded to the Internet are typically stored for some period of time on the device. Additionally, computer files or remnants of such files can be recovered even if they have been deleted. This is because when a person "deletes" the information on an electronic device, the data does not actually disappear, rather, the data remains on the storage medium until it is overwritten by new data. Information described in this affidavit can often be recovered by forensic computer experts using forensic tools and software.

29.     As further described in this affidavit and Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Devices** were used, where they were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on the **Target Devices** as more fully set forth in the factual section contained herein and because:

  a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file, including frequency channels, text messages, video, or photographs.

  b. Forensic evidence on a device can also indicate who has used or controlled the devices. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

  c. A person with appropriate familiarity of how an electronic device works may, after examining the forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

  d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant. Further, in finding evidence of how a device was used, the purpose of its use, who used it, when and where, sometimes it is necessary to establish that a particular thing is not present on a storage medium, for example, the absence of the entry of a name in a contact list as evidence that the user(s) of device did not have a relationship with the party.

## CONCLUSION

30. Based on the foregoing information, I submit that there is probable cause to for a search warrant authorizing the examination of the **Target Devices** described in Attachment A to seek the items described in Attachment B. I believe that the Target Phone contains evidence relating to the commission of a criminal offense, which is violations of 8 U.S.C. § 1324, as well as constitutes property designed for use, intended for use, or used in committing the aforementioned crime. The examination of the **Target Devices** may require authorities to employ techniques, including, but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence

described by the warrant. Because this warrant only seeks permission to examine devices already in the possession of the Border Patrol, the execution of this warrant does not involve the physical intrusion onto premises.

Consequently, there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

GERALD B ADAMS
Digitally signed by GERALD B ADAMS
Date: 2024.10.25 12:05:56 -07'00'

Gerald Adams, Border Patrol Agent
United States Border Patrol

Subscribed to electronically and sworn to telephonically before me this __25th__ day of October, 2024.

Honorable Eric J. Markovich
United States Magistrate Judge

10